**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| **MATTHEW JOHNSON and RHONDA JOHNSON,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**EQUIFAX INFORMATION SERVICES LLC, EXPERIAN INFORMATION SOLUTIONS, Inc., TRANS UNION LLC, and FORD MOTOR CREDIT COMPLANY,**<br><br>**Defendants.** | **Civil Action No. 2:26-cv-12629**<br><br>**With Jury Demand Endorsed** |

# COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiffs, Matthew Johnson and Rhonda Johnson ("Plaintiffs"), by and through counsel, for Plaintiffs' Complaint against Defendants Equifax Information Services LLC, Experian Information Solutions, Inc., Trans Union LLC, and Ford Motor Credit Company, jointly, severally, and in solido, state as follows:

## I. INTRODUCTION

1. Three of the Defendants, Equifax Information Services LLC, Experian Information Solutions, Inc., and Trans Union LLC are consumer reporting agencies ("CRAs") as defined by 15 U.S.C. § 1681a(f), and the other Defendant, Ford Motor Credit Company, is a furnisher of consumer information. All Defendants have violated 15 U.S.C. § 1681 *et seq.*, known as the Fair Credit Reporting Act (the "FCRA"). Plaintiffs seek to recover from Defendants actual,

statutory, and punitive damages, injunctive relief, legal fees, and expenses.

## II. PARTIES

2. Plaintiffs are natural persons residing in Vermillion, Ohio are "consumers," as defined by the FCRA, 15 U.S.C. § 1681a(c)**,** and are victims of repeated false credit reporting.

**Made Defendants herein are**:

3. Upon information and belief, Defendant Equifax Information Services LLC, which may also hereinafter be referred to as "Equifax," "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants" is a Georgia limited liability company that does substantial business in this judicial district and may be served by delivering a summons to its headquarters, 1550 Peachtree Street, Northwest, Atlanta, Georgia 30309. Equifax is a nationwide consumer reporting agency ("CRA") as defined by 15 U.S.C. § 1681a(f). Equifax regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Equifax disburses such consumer reports to third parties of contract for monetary compensation.

4. Upon information and belief, Experian Information Solutions, Inc., which may also hereinafter be referred to as "Experian", "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants,", does business in this judicial district and is an Ohio corporation with its principal place of business in California. Experian is a nationwide CRA as defined by 15 U.S.C. § 1681a(f). Experian regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Experian disburses such consumer reports to third parties of contract for monetary compensation.

5. Upon information and belief, Defendant Trans Union LLC, which may also hereinafter be referred to as "Trans Union", "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants" is an Illinois limited liability company that does business in this judicial district and may be served by delivering a summons to its headquarters, 555 West Adams Street, Chicago, Illinois 60681. Trans Union is a nationwide CRA as defined by 15 U.S.C. § 1681a(f). Trans Union regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Trans Union disburses such consumer reports to third parties of contract for monetary compensation.

6. Upon information and belief, Defendant Ford Motor Credit Company, which may also hereinafter be referred to as "Ford," "Defendant," "Defendants," "Furnisher Defendant," or "Furnisher Defendants," is a Michigan company that does substantial business in this judicial district and may be served by delivering a summons to its Legal Department at its headquarters, One American Road, Dearborn, Michigan 48126. Ford is a "person," as defined by the FCRA, 15 U.S.C. § 1681a(b), and a furnisher of consumer credit information to consumer reporting agencies.

7. As used herein, "consumer reporting agency," or "CRA," means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports (commonly referred to as "credit reports") to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports and is an entity in the business of collecting,

maintaining and disseminating information regarding the credit-worthiness of individuals. CRAs specifically include, but are not limited to, Equifax, Experian, and Trans Union.

## III. JURISDICTION AND VENUE

8. Plaintiffs respectfully assert that this Honorable Court has jurisdiction in this case arising under federal law. 28 U.S.C. § 1331, 1334, and 1367 and 15 U.S.C. § 1681(p). Plaintiffs also assert actions under states' laws which may be brought within the supplemental jurisdiction of this Court and Plaintiffs respectfully request that this Honorable Court exercise supplemental jurisdiction over said claims. 28 U.S.C. § 1367.

9. Venue is proper in this District, because the CRA Defendants and Furnisher Defendant(s) transact business in this District. Furnisher Defendant's headquarters is located in this judicial district, a substantial part of the conduct complained of occurred in this district, and various actions made basis of Plaintiffs' claims against Defendants occurred in the Eastern District of Michigan as further described. 28 U.S.C. § 1391.

10. Venue is further proper in this District, because the CRA Defendants entered into agreements with Furnisher Defendant in this judicial district to receive credit reporting data concerning Plaintiffs. Any and all requests to investigate Plaintiffs' disputes sent from the CRA Defendants as part of Defendants' reinvestigations were submitted to Furnisher Defendant's headquarters and investigated by Furnisher Defendant using its resources located at or closely connected to this judicial district. Furnisher Defendant managed Plaintiffs' account(s) from this judicial district including communicating amounts owed and conducting numerous communications via phone and letter.

## IV. FACTUAL ALLEGATIONS

11. In or around January 2020, Plaintiffs secured an auto loan with Ally and Ally assigned account number 227939*** (hereinafter the "Ally loan" or "Ally account" or "Ally tradeline").

12. In or around January 2021, Plaintiffs secured a mortgage loan for Plaintiffs' primary residence.

13. In or around September 2021, Plaintiffs secured an auto loan with Ford and Ford assigned account number 605686*** (hereinafter the "Ford loan" or "Ford account" or "Ford tradeline").

14. Due to unforeseen circumstances, Plaintiffs needed to file for bankruptcy protection under Chapter 13 of Title 11.

15. On or around December 20, 2021, Plaintiffs filed for bankruptcy protection under Chapter 13 of Title 11.

16. A redacted copy of Plaintiffs' chapter 13 bankruptcy docket report for Plaintiffs' bankruptcy case is attached hereto as Exhibit A.

17. Upon information and belief, Plaintiffs' mortgage was sold to, transferred to, purchased by, or otherwise acquired by BSI Mortgage and was assigned loan number 121804*** (hereinafter the "BSI mortgage" or "BSI loan" or "BSI account" or "BSI tradeline").

18. As part of Plaintiffs' chapter 13 bankruptcy, it was determined that Plaintiffs were to continue to pay on the BSI, Ally, and Ford loan(s) even after Plaintiffs filed for bankruptcy.

19. The Chapter 13 Plan specifically details that Plaintiffs were to make the mortgage payments to the Bankruptcy Trustee, and the Trustee would disperse the payments to BSI.

20. The Chapter 13 Plan specifically details that Plaintiffs were to make the auto payments outside the bankruptcy and directly to Ally and Ford. *See* Exhibit A.

21. During Plaintiffs' bankruptcy, Plaintiffs timely completed all of the loan payments for the BSI mortgage and Ally and Ford account(s). Plaintiffs are still owners of and still reside at the property that was the security interest for the BSI mortgage. Plaintiffs are the free and clear owners of the automobiles that were the security interests of the Ally and Ford accounts.

22. On October 9, 2025, the Plaintiffs were discharged from Chapter 13 Bankruptcy.

23. A redacted copy of Plaintiffs' chapter 13 Discharge Order is attached hereto as Exhibit B.

24. Sometime in March 2026, Plaintiffs obtained Plaintiffs' three-bureau credit reports and noticed that the Equifax, Experian, and Trans Union credit report(s) were not accurate.

25. Redacted copies of Plaintiffs' March 2026 tri-merge credit reports are attached hereto as Exhibits C and D.

26. Within the Tri-Merge credit reports, Plaintiffs noticed that Equifax reported the following inaccuracies for Plaintiffs' BSI mortgage.

27. The BSI mortgage was reporting a payment status of "Wage Earner Plan", a date of last payment of July 1, 2021, a date of last activity of July 1, 2021, a high balance of $0.00, and within the creditor remarks it was reporting the "Account involved in Chapter 13 debt adj. Closed or paid account/zero balance included in Chapter 13".

28. This reporting is incorrect because Plaintiffs completed all the required loan payments for the BSI mortgage, the mortgage was closed and transferred to another servicer and Plaintiffs still own and reside at the property that was the security interest of the BSI mortgage. The current reporting is a significant misrepresentation of this fully paid and closed account.

29. The accurate reporting of the BSI mortgage would have been to report a payment status of "Current", a date of last activity as of the last payment date, a high balance of $372,744,

and should have reported within the creditor remarks section "Mortgage closed or paid account/zero balance".

30. The current reporting of the BSI mortgage materially misleads lenders to believe Plaintiffs surrendered the property that was/is the security interest of the BSI mortgage and converted the BSI mortgage to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

31. The current reporting of the BSI mortgage was never an "historically accurate" way to report the BSI mortgage.

32. Within the Tri-Merge credit report, Plaintiffs noticed that Equifax reported the following inaccuracies for Plaintiffs' Ally account.

33. The Ally account was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", a date of last payment of August 1, 2021, a date of last activity of August 1, 2021, a high balance of $0.00, and within the creditor remarks it was reporting the "Account involved in Chapter 13 debt adj. Auto included in Chapter 13".

34. This reporting is incorrect because Plaintiffs completed all the required loan payments for the Ally account, Plaintiffs are the free and clear owners of the automobile that was the security interest of the Ally account, and the current reporting is a significant misrepresentation of this fully paid and closed account.

35. The accurate reporting of the Ally account would have been to report a payment status of "Current", an account rating of "Paid/Closed", a date of last activity as of the last payment date, a high balance of $17,188, and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

36. The current reporting of the Ally account materially misleads lenders to believe

Plaintiffs surrendered the automobile that was/is the security interest of the Ally account and converted the Ally loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

37. The current reporting of the Ally account was never an "historically accurate" way to report the Ally account.

38. Within the Tri-Merge credit report, Plaintiffs noticed that Equifax reported the following inaccuracies for Plaintiffs' Ford account.

39. The Ford account was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", a date of last payment of December 1, 2021, a date of last activity of December 1, 2021, a high balance of $0.00, and within the creditor remarks it was reporting the "Account involved in Chapter 13 debt adj. Auto included in Chapter 13".

40. This reporting is incorrect because Plaintiffs completed all the required loan payments for the Ford account, Plaintiffs are the free and clear owners of the automobile that was the security interest of the Ford account, and the current reporting is a significant misrepresentation of this fully paid and closed account.

41. The accurate reporting of the Ford account would have been to report a payment status of "Current", an account rating of "Paid/Closed", a date of last activity as of the last payment date, a high balance of $63,438, and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

42. The current reporting of the Ford account materially misleads lenders to believe Plaintiffs surrendered the automobile that was/is the security interest of the Ford account and converted the Ford loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

43. The current reporting of the Ford account was never an "historically accurate" way to report the Auto Lender account.

44. Within the Tri-Merge credit report, Plaintiffs noticed that Experian reported the following inaccuracies for Plaintiffs' BSI mortgage.

45. The BSI mortgage was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", no date of last payment, a date of last activity of December 1, 2024, and within the creditor remarks it was reporting the "Debt included in or discharged through Bankruptcy Chapter 13.".

46. This reporting is incorrect because Plaintiffs completed all the required loan payments for the BSI mortgage, the mortgage was closed and transferred to another servicer and Plaintiffs still own and reside at the property that was the security interest of the BSI mortgage. The current reporting is a significant misrepresentation of this fully paid and closed account.

47. The accurate reporting of the BSI mortgage would have been to report a payment status of "Current", an account rating of "Paid/Closed", a date of last activity as of the last payment date, and should have reported within the creditor remarks section "Mortgage closed or paid account/zero balance".

48. The current reporting of the BSI mortgage materially misleads lenders to believe Plaintiffs surrendered the property that was/is the security interest of the BSI mortgage and converted the BSI mortgage to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

49. The current reporting of the BSI mortgage was never an "historically accurate" way to report the BSI mortgage.

50. Within the Tri-Merge credit report, Plaintiffs noticed that Experian reported the

following inaccuracies for Plaintiffs' Ally account.

51. The Ally account was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", no date of last payment, a date of last activity of December 1, 2021, and within the creditor remarks it was reporting the "Debt included in or discharged through Bankruptcy Chapter 13.".

52. This reporting is incorrect because Plaintiffs completed all the required loan payments for the Ally account, Plaintiffs are the free and clear owners of the automobile that was the security interest of the Ally account, and the current reporting is a significant misrepresentation of this fully paid and closed account.

53. The accurate reporting of the Ally account would have been to report a payment status of "Current", an account rating of "Paid/Closed", a date of last activity as of the last payment date, and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

54. The current reporting of the Ally account materially misleads lenders to believe Plaintiffs surrendered the automobile that was/is the security interest of the Ally account and converted the Ally loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

55. The current reporting of the Ally account was never an "historically accurate" way to report the Auto Lender account.

56. Within the Tri-Merge credit report, Plaintiffs noticed that Experian reported the following inaccuracies for Plaintiffs' Ford account.

57. The Ford account was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", no date of last payment, a date of last activity of December 1,

2021, and within the creditor remarks it was reporting the "Debt included in or discharged through Bankruptcy Chapter 13.".

58. This reporting is incorrect because Plaintiffs completed all the required loan payments for the Ford account, Plaintiffs are the free and clear owners of the automobile that was the security interest of the Ford account, and the current reporting is a significant misrepresentation of this fully paid and closed account.

59. The accurate reporting of the Ford account would have been to report a payment status of "Current", an account rating of "Paid/Closed", a date of last activity as of the last payment date, and should have reported within the creditor remarks section "Auto closed or paid account/zero balance".

60. The current reporting of the Ford account materially misleads lenders to believe Plaintiffs surrendered the automobile that was/is the security interest of the Ford account and converted the Ford loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

61. The current reporting of the Ford account was never an "historically accurate" way to report the Auto Lender account.

62. Within the Tri-Merge credit report, Plaintiffs noticed that Trans Union reported the following inaccuracies for Plaintiffs' BSI mortgage.

63. The BSI mortgage was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", a date of last payment of June 12, 2025, a date of last activity of June 12, 2025, and within the creditor remarks it was reporting the "Chapter 13; wage earner plan account".

64. This reporting is incorrect because Plaintiffs completed all the required loan

payments for the BSI mortgage, the mortgage was closed and transferred to another servicer and Plaintiffs still own and reside at the property that was the security interest of the BSI mortgage. The current reporting is a significant misrepresentation of this fully paid and closed account.

65. The accurate reporting of the BSI mortgage would have been to report a payment status of "Current", an account rating of "Paid/Closed", a date of last activity as of the last payment date, and should have reported within the creditor remarks section "Mortgage closed or paid account/zero balance".

66. The current reporting of the BSI mortgage materially misleads lenders to believe Plaintiffs surrendered the property that was/is the security interest of the BSI mortgage and converted the BSI mortgage to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

67. The current reporting of the BSI mortgage was never an "historically accurate" way to report the BSI mortgage.

68. Within the Tri-Merge credit report, Plaintiffs noticed that Trans Union reported the following inaccuracies for Plaintiffs' Ally account.

69. The Ally account was reporting a payment status of "Wage Earner Plan", an account rating of "Derogatory", a date of last payment of April 26, 2022, a date of last activity of March 16, 2022, and within the creditor remarks it was reporting the "Chapter 13; wage earner plan account".

70. This reporting is incorrect because Plaintiffs completed all the required loan payments for the Ally account, Plaintiffs are the free and clear owners of the automobile that was the security interest of the Ally account, and the current reporting is a significant misrepresentation of this fully paid and closed account.

71. The accurate reporting of the Ally account would have been to report a payment status of “Current”, an account rating of “Paid/Closed”, a date of last activity as of the last payment date, and should have reported within the creditor remarks section “Auto closed or paid account/zero balance”.

72. The current reporting of the Ally account materially misleads lenders to believe Plaintiffs surrendered the automobile that was/is the security interest of the Ally account and converted the Ally loan to an unsecured debt and discharged the debt by way of Plaintiff’s chapter 13 bankruptcy.

73. The current reporting of the Ally account was never an “historically accurate” way to report the Ally account.

74. Within the Tri-Merge credit report, Plaintiffs noticed that Trans Union reported the following inaccuracies for Plaintiffs’ Ford account.

75. The Ford account was reporting an account rating of “Derogatory”, a date of last payment of August 22, 2025, a date of last activity of October 15, 2025, and within the creditor remarks it was reporting the “Chapter 13; wage earner plan account”.

76. This reporting is incorrect because Plaintiffs completed all the required loan payments for the Ford account, Plaintiffs are the free and clear owners of the automobile that was the security interest of the Ford account, and the current reporting is a significant misrepresentation of this fully paid and closed account.

77. The accurate reporting of the Ford account would have been to report an account rating of “Paid/Closed”, a date of last activity as of the last payment date, and should have reported within the creditor remarks section “Auto closed or paid account/zero balance”.

78. The current reporting of the Ford account materially misleads lenders to believe

Plaintiffs surrendered the automobile that was/is the security interest of the Ford account and converted the Ford loan to an unsecured debt and discharged the debt by way of Plaintiff's chapter 13 bankruptcy.

79. The current reporting of the Ford account was never an "historically accurate" way to report the Ford account.

80. On or about March 31, 2026, Plaintiffs sent direct disputes to the CRA Defendant(s) and requested that the CRAs investigate the reporting of the BSI mortgage, Ally account, and Ford account, and Plaintiffs specifically addressed the above referenced issues with the reporting stated in the above Paragraphs. Plaintiffs requested that under the FCRA, the CRAs conduct reasonable investigations and/or remedy the inaccuracies on Plaintiffs' credit reports concerning the accounts.

81. Redacted copies of Plaintiffs' unsigned dispute letters sent to CRAs are attached hereto as Exhibits E, F, G, H, I, and J respectively.

82. Equifax failed to respond to Plaintiffs' disputes.

83. Plaintiffs requested an updated consumer report to see if any changes were made on Plaintiffs' Consumer Reports.

84. Redacted copies of Plaintiffs' updated tri-merge credit reports are each attached hereto as Exhibit K and L.

85. The updated Consumer Reports showed that Equifax made none of the substantive changes Plaintiffs requested in the direct dispute to Equifax, aand continued to report the BSI mortgage inaccurately.

86. The BSI mortgage continued to report a payment status of "Wage Earner Plan", an account rating of "Derogatory", a date of last payment of July 1, 2021, a date of last activity

of July 1, 2021, a high balance of $0.00, a dispute status of "Account not disputed", and within the creditor remarks it was reporting the "Account involved in Chapter 13 debt adj. Real Estate Mortgage Included in Chapter 13". Additionally, there were no remarks that this account was disputed.

87. Equifax's response, or lack thereof, was not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the BSI mortgage and gave no explanation as to why the BSI mortgage was still reporting inaccurately.

88. Plaintiffs' inaccurate Equifax consumer reports were disseminated to third parties before and/or after the instant dispute.

89. The current reporting of the BSI mortgage materially misleads lenders to believe Plaintiffs surrendered the property that was the security interest of the BSI loan and converted the BSI loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

90. Equifax chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiffs' BSI mortgage.

91. Upon the Plaintiffs' request to Equifax for verification and correction regarding the BSI mortgage, and in accordance with Equifax's standard procedures, Equifax did not evaluate or consider any of Plaintiffs' information, claims or evidence, and did not make any attempt to verify the reporting of the BSI mortgage substantially or reasonably.

92. Equifax has adopted the Metro 2 reporting standard, Equifax deviated from the standard based on its conduct in this case, and by Equifax deviating from the adopted standard, Equifax injured Plaintiffs' credit standing.

93. In the alternative, Equifax failed to contact Furnisher Defendant, therefore, failed to perform any investigation at all.

94. In the alternative to the allegation that Equifax failed to contact Furnisher Defendant, it is alleged that Equifax did forward some notice of the dispute to the Furnisher Defendant, and the Furnisher Defendant failed to conduct a lawful investigation.

95. The updated Consumer Reports showed that Equifax made none of the substantive changes Plaintiffs requested in the direct dispute to Equifax, and continued to report the Ally account inaccurately.

96. The Ally account now reported a payment status of "Collection/Chargeoff", an account rating of "Derogatory", a date of last payment of August 1, 2021, a date of last activity of August 1, 2021, a high balance of $4,513, a balanced owed of $4,513, a past due amount of $4,513, and within the creditor remarks it was reporting the "Consumer disputes after resolution Charged off account".

97. Equifax's response, or lack thereof, was not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the Ally account and gave no explanation as to why the Ally account was still reporting inaccurately.

98. Plaintiffs' inaccurate Equifax consumer reports were disseminated to third parties before and/or after the instant dispute.

99. The current reporting of the Ally account materially misleads lenders to believe Plaintiffs surrendered the automobile that was the security interest of the Ally account, converted the Ally loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy, and that they still owe a balance and are past due in their payments.

100. Equifax chose to "verify" false information from an unreliable source, failed to

correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiffs' Ally account.

101. Upon the Plaintiffs' request to Equifax for verification and correction regarding the Ally account, and in accordance with Equifax's standard procedures, Equifax did not evaluate or consider any of Plaintiffs' information, claims or evidence, and did not make any attempt to verify the reporting of the Ally account substantially or reasonably.

102. Equifax has adopted the Metro 2 reporting standard, Equifax deviated from the standard based on its conduct in this case, and by Equifax deviating from the adopted standard, Equifax injured Plaintiffs' credit standing.

103. In the alternative, Equifax failed to contact Ally, therefore, failed to perform any investigation at all.

104. In the alternative to the allegation that Equifax failed to contact Ally, it is alleged that Equifax did forward some notice of the dispute to Ally, and still failed to conduct a lawful investigation.

105. The updated Consumer Reports showed that Equifax made none of the substantive changes Plaintiffs requested in the direct dispute to Equifax, and continued to report the Ford account inaccurately.

106. The Ford account continued to report a payment status of "Wage Earner Plan", an account rating of "Derogatory", a date of last payment of December 1, 2021, a date of last activity of December 1, 2021, a high balance of $0.00, a dispute status of "Account not disputed", and within the creditor remarks it was reporting the "Account involved in Chapter 13 debt adj. Included in Chapter 13". Additionally, there were no remarks that this account was disputed.

107. Equifax's response, or lack thereof, was not the result of a reasonable investigation

into Plaintiffs' disputes and failed to remedy the inaccuracies within the Ford account and gave no explanation as to why the Ford account was still reporting inaccurately.

108. Plaintiffs' inaccurate Equifax consumer reports were disseminated to third parties before and/or after the instant dispute.

109. The current reporting of the Ford account materially misleads lenders to believe Plaintiffs surrendered the automobile that was the security interest of the Ford account and converted the Ford loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

110. Equifax chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiffs' Ford account.

111. Upon the Plaintiffs' request to Equifax for verification and correction regarding the Ford account, and in accordance with Equifax's standard procedures, Equifax did not evaluate or consider any of Plaintiffs' information, claims or evidence, and did not make any attempt to verify the reporting of the Ford account substantially or reasonably.

112. Equifax has adopted the Metro 2 reporting standard, Equifax deviated from the standard based on its conduct in this case, and by Equifax deviating from the adopted standard, Equifax injured Plaintiffs' credit standing.

113. In the alternative, Equifax failed to contact Furnisher Defendant, therefore, failed to perform any investigation at all.

114. In the alternative to the allegation that Equifax failed to contact Furnisher Defendant, it is alleged that Equifax did forward some notice of the dispute to the Furnisher Defendant, and the Furnisher Defendant failed to conduct a lawful investigation.

115. Furnisher Defendant knows how to report the Ford account accurately, and their response to the CRA was willfully reckless.

116. Furnisher Defendant knows the current reporting of the Ford account materially misleads lenders to believe Plaintiffs surrendered the automobile that was the security interest of the Ford account and converted the Ford loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

117. Furnisher Defendant knows the current reporting of the Ford account was never an "historically accurate" way to report the Ford account.

118. Experian responded to Plaintiffs' disputes on April 28, 2026.

119. Redacted copies of Experian's responses are each attached hereto as Exhibits M and N.

120. Plaintiffs requested an updated consumer report to see if any changes were made on Plaintiffs' Consumer Reports. *See* Exhibits K and L.

121. Experian's responses and the updated Consumer Reports showed that Experian made none of the substantive changes Plaintiffs requested in the direct dispute to Experian, and continued to report the BSI mortgage inaccurately.

122. The BSI mortgage continued to report a payment status of "Wage Earner Plan", an account rating of "Derogatory", no date of last payment, a date of last activity for Matthew of December 1, 2021 and Rhonda July 1, 2021, a dispute status of "Account not disputed", and within the creditor remarks it was reporting the "Debt included in or discharged through Bankruptcy Chapter 13.". Additionally, there were no remarks that this account was disputed.

123. Experian's response, or lack thereof, was not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the BSI

mortgage and gave no explanation as to why the BSI mortgage was still reporting inaccurately.

124. Plaintiffs' inaccurate Experian consumer report was disseminated to third parties before and/or after the instant dispute.

125. The current reporting of the BSI mortgage materially misleads lenders to believe Plaintiffs surrendered the property that was the security interest of the BSI loan and converted the BSI loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

126. Experian chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiff's BSI mortgage.

127. Upon the Plaintiff's request to Experian for verification and correction regarding the BSI mortgage, and in accordance with Experian's standard procedures, Experian did not evaluate or consider any of Plaintiffs' information, claims or evidence, and did not make any attempt to verify the reporting of the BSI mortgage substantially or reasonably.

128. Experian has adopted the Metro 2 reporting standard, Experian deviated from the standard based on its conduct in this case, and by Experian deviating from the adopted standard, Experian injured Plaintiffs' credit standing.

129. In the alternative, Experian failed to contact BSI, and therefore, failed to perform any investigation at all.

130. In the alternative to the allegation that Experian failed to contact BSI, it is alleged that Experian did forward some notice of the dispute to the BSI, and still failed to conduct a lawful investigation.

131. Experian's responses and the updated Consumer Reports showed that Experian

made none of the substantive changes Plaintiffs requested in the direct dispute to Experian, and and continued to report the Ally account inaccurately.

132. The Ally account continued to report a payment status of "Wage Earner Plan", an account rating of "Derogatory", no date of last payment, a date of last activity of December 1, 2021, a dispute status of "Account not disputed", and within the creditor remarks it was reporting the "Subscriber reports dispute resolved – consumer disagrees Account was in dispute – now resolved – reported by subscriber. Debt included in or discharged through Bankruptcy Chapter 13.". Notably, though there were remarks that this account was disputed the dispute status field stated otherwise.

133. Experian's response, or lack thereof, was not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the Ally account and gave no explanation as to why the Ally account was still reporting inaccurately.

134. Plaintiffs' inaccurate Experian consumer reports were disseminated to third parties before and/or after the instant dispute.

135. The current reporting of the Ally account materially misleads lenders to believe Plaintiffs surrendered the automobile that was the security interest of the Ally account and converted the Ally loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

136. Experian chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiffs' Ally account.

137. Upon the Plaintiffs' request to Experian for verification and correction regarding the Ally account, and in accordance with Experian's standard procedures, Experian did not

evaluate or consider any of Plaintiffs' information, claims or evidence, and did not make any attempt to verify the reporting of the Ally account substantially or reasonably.

138. Experian has adopted the Metro 2 reporting standard, Experian deviated from the standard based on its conduct in this case, and by Experian deviating from the adopted standard, Experian injured Plaintiffs' credit standing.

139. In the alternative, Experian failed to contact Furnisher Defendant, and therefore, failed to perform any investigation at all.

140. In the alternative to the allegation that Experian failed to contact Ally, it is alleged that Experian did forward some notice of the dispute to Ally, and still failed to conduct a lawful investigation.

141. Experian's responses and the updated Consumer Reports showed that Experian made none of the substantive changes Plaintiffs requested in the direct dispute to Experian, and and continued to report the Ford account inaccurately.

142. The Ford account continued to report a payment status of "Wage Earner Plan", an account rating of "Derogatory", no date of last payment, a date of last activity of December 1, 2019, a high balance of $0.00, a dispute status of "Account not disputed", and within the creditor remarks it was reporting the "Debt included in or discharged through Bankruptcy Chapter 13.". Additionally, there were no remarks that this account was disputed.

143. Experian's response, or lack thereof, was not the result of a reasonable investigation into Plaintiffs' disputes and failed to remedy the inaccuracies within the Ford account and gave no explanation as to why the Ford account was still reporting inaccurately.

144. Plaintiffs' inaccurate Experian consumer reports were disseminated to third parties before and/or after the instant dispute.

145. The current reporting of the Ford account materially misleads lenders to believe Plaintiffs surrendered the automobile that was the security interest of the Ford account and converted the Ford loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

146. Experian chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiffs' Ford account.

147. Upon the Plaintiffs' request to Experian for verification and correction regarding the Ford account, and in accordance with Experian's standard procedures, Experian did not evaluate or consider any of Plaintiffs' information, claims or evidence, and did not make any attempt to verify the reporting of the Ford account substantially or reasonably.

148. Experian has adopted the Metro 2 reporting standard, Experian deviated from the standard based on its conduct in this case, and by Experian deviating from the adopted standard, Experian injured Plaintiffs' credit standing.

149. In the alternative, Experian failed to contact Furnisher Defendant, and therefore, failed to perform any investigation at all.

150. In the alternative to the allegation that Experian failed to contact Furnisher Defendant, it is alleged that Experian did forward some notice of the dispute to the Furnisher Defendant, and the Furnisher Defendant failed to conduct a lawful investigation.

151. Furnisher Defendant knows how to report the Ford account accurately, and their response to the CRA was willfully reckless.

152. Furnisher Defendant knows the current reporting of the Ford account materially misleads lenders to believe Plaintiffs surrendered the automobile that was the security interest of

the Ford account and converted the Ford loan to an unsecured debt and discharged the debt by way of Plaintiffs' chapter 13 bankruptcy.

153. Furnisher Defendant knows the current reporting of the Ford account was never an "historically accurate" way to report the Ford account.

154. Trans Union responded to Plaintiffs' disputes on May 2, 2026.

155. Redacted copies of Trans Union's responses are each attached hereto as Exhibits O and P.

156. Plaintiffs requested an updated consumer report to see if any changes were made on Plaintiffs' Consumer Reports. *See* Exhibits K and L.

157. Trans Union's responses and the updated Consumer Reports showed that Trans Union made none of the substantive changes Plaintiffs requested in the direct dispute to Trans Union and deleted EVERYTHING for both Plaintiffs. Trans Union provided no explanation or reasons for an outright deletion of the BSI mortgage, and Ally and Ford accounts.

158. Trans Union's response, or lack thereof, were not the result of a reasonable investigation into Plaintiffs' disputes, and Trans Union failed to remedy the inaccuracies within the BSI mortgage, and Ally and Ford accounts.

159. Upon the Plaintiffs' requests to Trans Union to verify and correct the BSI mortgage, and Ally and Ford accounts, and in accordance with Trans Union's standard procedures, as well as the FCRA, because Trans Union ignored the evidence Plaintiffs included with Plaintiffs' dispute letters and unilaterally deleted the BSI mortgage, and Ally and Ford accounts from Plaintiffs' Consumer Reports.

160. Trans Union seemingly saw the word "Bankruptcy" in Plaintiffs' dispute letters and unilaterally decided to delete the BSI mortgage, and Ally and Ford accounts and not even

attempt to contact the furnishers of credit information.

161. Trans Union simply ignored Plaintiffs' requests to involve Plaintiffs' lenders for the BSI mortgage, and Ally and Ford accounts and did not evaluate or consider the actual statuses of these accounts and lazily deleted the BSI mortgage, and Ally and Ford accounts without any explanation.

162. Trans Union's willful failure to involve BSI, Ally, and Ford in Plaintiffs' FCRA disputes is a willful violation of the Fair Credit Reporting Act (FCRA) under § 1681i(a)(2). The FCRA required Trans Union to promptly notify BSI, Ally, and Ford of the disputes and provide all relevant information it received from Plaintiffs for BSI, Ally, and Ford to investigate.

163. Trans Union willfully decided to keep Plaintiffs' disputes to themselves and deleted the BSI mortgage, and Ally and Ford accounts without perform any investigation at all.

164. Trans Union's failure to investigate Plaintiffs' dispute letters, its failure to include BSI, Ally, and Ford in the dispute process, and its willful actions have injured Plaintiffs' credit standing.

165. In the alternative to the allegation that Trans Union failed to contact BSI, Ally, and Ford, it is alleged that Trans Union did forward some notice of the dispute to all furnishers, and the Furnisher Defendant, BSI, Ally, and Trans Union still failed to conduct a lawful investigation.

## V. GROUNDS FOR RELIEF

### EQUIFAX'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681e(b))

166. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

167. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

168. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

169. Equifax knew or should have known of Plaintiffs' bankruptcy status, history, and/or payment history were reporting inaccurately, and yet, Equifax continued to prepare a patently false consumer report concerning Plaintiffs.

170. Despite actual and implied knowledge that Plaintiffs' credit report was and/or is not accurate, Equifax readily provided false reports to one or more third parties, thereby misrepresenting Plaintiffs, and ultimately Plaintiffs' creditworthiness.

171. After Equifax knew or should have known Plaintiffs' bankruptcy status, history, and/or payment history were inaccurate for Plaintiffs' BSI mortgage, and Ally and Ford tradeline(s), it failed to make the corrections as would be required to attain "maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b).

172. As a result of Equifax's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost

credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

173. Equifax's conduct, action, and inaction, were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction were negligent, entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

174. The Plaintiffs are entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

**EQUIFAX'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681i)**

175. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

176. Equifax violated 15 U.S.C. § 1681i on multiple occasions by failing to update or correct inaccurate information in the Plaintiffs' credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiffs' credit files, and relying upon verification from a source it has reason to know is unreliable.

177. As a result of Equifax's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit scores may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and

expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

178. Equifax's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

179. The Plaintiffs are entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

**EXPERIAN'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681e(b))**

180. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

181. Experian violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

182. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of

the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

183. Experian knew or should have known of Plaintiffs' bankruptcy status, history, and/or payment history were reporting inaccurately, and yet, Experian continued to prepare a patently false consumer report concerning Plaintiffs.

184. Despite actual and implied knowledge that Plaintiffs' credit report was and/or is not accurate, Experian readily provided false reports to one or more third parties, thereby misrepresenting Plaintiffs, and ultimately Plaintiffs' creditworthiness.

185. After Experian knew or should have known Plaintiffs' bankruptcy status, history, and/or payment history were inaccurate for Plaintiffs' BSI mortgage, and Ally and Ford tradeline(s), it failed to make the corrections as would be required to attain "maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b).

186. As a result of Experian's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates

Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

187. Experian's conduct, action, and inaction, were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction were negligent, entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

188. The Plaintiffs are entitled to recover costs and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

**EXPERIAN'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681i)**

189. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

190. Experian violated 15 U.S.C. § 1681i on multiple occasions by failing to update or correct inaccurate information in the Plaintiffs' credit files after receiving actual notice of such

inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiffs' credit files, and relying upon verification from a source it has reason to know is unreliable.

191. As a result of Experian's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit scores may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to

explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

192. Experian's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

193. The Plaintiffs are entitled to recover costs and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

**TRANS UNION'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681e(b))**

194. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

195. Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

196. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

197. Trans Union knew or should have known of Plaintiffs' bankruptcy status, history, and/or payment history were reporting inaccurately, and yet, Trans Union continued to prepare a patently false consumer report concerning Plaintiffs.

198. Despite actual and implied knowledge that Plaintiffs' credit report was and/or is

not accurate, Trans Union readily provided false reports to one or more third parties, thereby misrepresenting Plaintiffs, and ultimately Plaintiffs' creditworthiness.

199. After Trans Union knew or should have known Plaintiffs' bankruptcy status, history, and/or payment history were inaccurate for Plaintiffs' BSI mortgage, and Ally and Ford accounts tradeline(s), it failed to make the corrections as would be required to attain "maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b).

200. As a result of Trans Union's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit, loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by

Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

201. Trans Union's conduct, action, and inaction, were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction were negligent, entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

202. The Plaintiffs are entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

**TRANS UNION'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681i)**

203. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

204. Trans Union violated 15 U.S.C. § 1681i on multiple occasions by failing to update or correct inaccurate information in the Plaintiffs' credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiffs' credit files, and relying upon verification from a source it has reason to know is unreliable.

205. As a result of Trans Union's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' abilities to finance goods; loss of credit,

loss of the abilities to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit scores may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendant.

206. Trans Union's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

207. The Plaintiffs are entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

**FORD'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681s-2(b))**

208. The Plaintiffs reallege and incorporate all paragraphs above as if fully set out herein.

209. Furnisher Defendant violated 15 U.S.C. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of Plaintiffs' dispute(s) from one or more consumer reporting agencies, and/or failing to appropriately report the results of their investigations, and/or failing to appropriately modify the information.

210. Furnisher Defendant further violated 15 U.S.C. § 1681s-2(b) by continuing to report the Ford Tradeline(s) within Plaintiffs' credit files with the CRA Defendants without also including a notation that this debt was disputed, failing to fully and properly investigate the Plaintiffs' disputes of the Ford Tradeline(s), failing to accurately respond to the CRA Defendants, failing to correctly report results of an accurate investigation to every other consumer reporting agency, and failing to permanently and lawfully correct its own internal records to prevent the re-reporting of inaccurate information to the Ford Tradeline(s) within the consumer reporting agencies reports.

211. As a result of Furnisher Defendant's conduct, action, and inaction, the Plaintiffs suffered damages, including, but not limited to: loss in Plaintiffs' ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost

credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit scores may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believe Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiffs have spent trying to repair Plaintiff's credit in light of the damage done to it continuously by Defendant.

212. Furnisher Defendant's conduct, action, and inaction, were willful, rendering it liable for actual or statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiffs to recover actual damages under 15 U.S.C. § 1681o.

## VI. VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

213. Plaintiffs will be able to show, after reasonable discovery, that all actions at issue were taken by employees, agents, servants, or representatives, of any type, for Defendants, the

principals, within the line and scope of such individuals' (or entities') express or implied authority, through employment, agency, or representation, which imputes liability to Defendants for all such actions under the doctrine of respondent superior and/or vicarious liability.

## VII. DAMAGES

214. Plaintiffs respectfully request that this Honorable Court instruct the jury, as the trier of facts, that in addition to actual or compensatory damages, punitive or exemplary damages may be awarded against the Defendants under the provisions of the FCRA and/or states' laws, including Michigan.

215. Plaintiffs respectfully request that this Honorable Court award Plaintiffs' litigation expenses and other costs of litigation and reasonable attorney's fees incurred in this litigation, in accordance with the provisions of the FCRA and/or other laws.

216. The above and foregoing actions, inactions, and fault of Defendants, as to each and every claim, have proximately caused a wide variety of damages to Plaintiffs.

217. Defendants performed perfunctory and essentially useless reinvestigations resulting in the verification of false reportings about the Plaintiffs and have been a substantial factor in causing credit denials and other damages.

218. Plaintiffs suffered a variety of damages, including economic and non-economic damages as prayed for herein.

219. Defendants have negligently and/or willfully violated various provisions of the FCRA and are thereby liable unto Plaintiffs.

220. Defendants are liable unto Plaintiffs for all actual, statutory, exemplary and punitive damages awarded in this case, as well as other demands and claims asserted herein including, but not limited to: out-of-pocket expenses; credit denials; loss in Plaintiffs' ability to

finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiffs did not receive because of the false and derogatory information contained in Plaintiffs' credit reports; Plaintiffs' lowered credit scores may have impacted the interest rates Plaintiffs have on current loans; Plaintiffs' lowered credit score may have impacted the interest rates Plaintiffs received during this ordeal; Plaintiffs' lowered credit score may have impacted the credit limits Plaintiffs have on existing accounts; Plaintiffs spent considerable time, effort, and expense attempting to force Defendants to comply with Defendants' statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendants; loss of self-esteem because of Defendants' continued persistence in painting Plaintiffs in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiffs believes Plaintiffs will be forced to be subjected to the humiliation of having to explain the false and defamatory information; the costs and time Plaintiffs have spent trying to repair Plaintiffs' credit in light of the damage done to it continuously by Defendants; attorney's fees; court costs; and other assessments proper by law and any and all other applicable federal and state laws, together with legal interest thereon from date of judicial demand until paid.

**WHEREFORE PREMESIS CONSIDERED**, Plaintiffs pray that this Honorable Court:

A. Enter Judgment in favor of Plaintiffs and against Defendants Equifax Information Services LLC, Experian Information Solutions, Inc., Trans Union LLC, and [Ford Motor Credit Company jointly, severally, and in solido, for all reasonable damages sustained by Plaintiffs, including, but not limited to, actual damages, compensatory damages, out-of-pocket expenses, credit denials, costs and time of repairing Plaintiffs' credit, pain and suffering, embarrassment, inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, and fear of personal and financial safety and security for Defendants' violations of the FCRA, applicable state law, and common law;

B. Find that the appropriate circumstances exist for an award of punitive damages to Plaintiffs;

C. Award Plaintiffs pre-judgment and post-judgment interest, as allowed by law;

D. Order that CRA Defendants, Equifax Information Services LLC, Experian Information Solutions, Inc., and Trans Union LLC, and Furnisher Defendant, Ford Motor Credit Company, and lenders BSI and Ally work in conjunction, cooperatively, and/or individually to reinvestigate and correct the consumer report(s), credit report(s), data emanations, consumer histories, and credit histories of and concerning Plaintiffs and/or any of Plaintiffs' personal identifiers.

E. Grant such other and further relief, in law or equity, to which Plaintiffs might show Plaintiffs are justly entitled.

Date Filed: July 30, 2026

Respectfully submitted,

*/s/ Blake R. Bauer*

Blake R. Bauer
MN Bar Number 0396262
*(admitted pro hac vice to the USDC for the EDMI)*
Blake@fieldslaw.com
FIELDS LAW FIRM
9999 Wayzata Blvd.
Minnetonka, Minnesota 55305
(612) 383-1868 (telephone)
(612) 370-4256 (fax)

***Lead Counsel for Plaintiff***

**JURY DEMAND**

Plaintiffs hereby demands a trial by jury on all issues so triable.

July 30, 2026 — */s/ Blake R. Bauer*
Date — Blake R. Bauer